**Charlie McGEE, Plaintiff–Appellant and Cross–Appellee,**

v.

**EQUICOR–EQUITABLE HCA CORPORATION, and Equicor Health Plan, Inc., Defendants–Appellees and Cross–Appellants.**

Nos. 90–3209, 90–3217.

United States Court of Appeals, Tenth Circuit.

Jan. 13, 1992.

Phillip R. Fields (Steven P. Smith, with him on the briefs), Wichita, Kan., for plaintiff-appellant and cross-appellee.

Donald W. Bostwick of Adams, Jones, Robinson & Malone, Wichita, Kan., for defendants-appellees and cross-appellants.

Before SEYMOUR, BARRETT and BRORBY, Circuit Judges.

BRORBY, Circuit Judge.

We are called upon to resolve a contract dispute over the extent of medical benefits coverage provided by a Health Maintenance Organization (HMO) to a participant of a welfare benefit plan governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461 (1988).

The district court found the HMO wrongfully denied Plaintiff coverage for two of twenty-five months of rehabilitative care his minor daughter received following an automobile accident. In addition, the district court awarded attorney's fees and costs to Plaintiff.

Both parties appeal. Plaintiff asserts the trial court erred by not finding the HMO liable for coverage for the full twenty-five months of his daughter's rehabilitative care at costs totaling $358,789.63. Plaintiff also seeks reimbursement at the health plan's nursing home rate of $175 per day for his daughter's rehabilitation during an additional three months in the fall of 1989. Alternatively, Plaintiff argues the plan, at a minimum, entitles him to costs for his daughter's entire rehabilitative care at the plan's nursing home rate. Defendants cross appeal contending their policy unambiguously limits benefits coverage to the initial hospital care and the approved sixty days short term rehabilitation Plaintiff's daughter received immediately after the accident. They claim the district court erred by awarding Plaintiff coverage for an additional two months of rehabilitative services at a specialized hospital for neurological injuries outside the HMO's geographical coverage area. Defendants assert the district court impermissibly applied

rules of insurance law when interpreting the terms of the agreement and claim the contract terms should not be strictly construed against them. Defendants also argue a trial court should not award attorney's fees "as a matter of course" under an ERISA plan.

While we find portions of the district court's reasoning unclear and some of its findings irreconcilable, we cannot say the district court reached an incorrect result. Accordingly, we affirm.

## BACKGROUND

For clarity we summarize only the salient facts. On May 9, 1987, Plaintiff Charlie McGee's seventeen year old daughter, Rachel, received serious injuries in a head-on automobile collision. Hospital personnel flew Ms. McGee to Wesley Medical Center in Wichita, Kansas, where doctors treated her for, among other things, a broken femur and a brain stem injury.

Ms. McGee's status as a dependent of Mr. McGee entitled her to health care benefits under an HMO plan offered to employees of Cessna Aircraft Corporation, where Plaintiff worked. Health Care Plus originally provided benefits under the health agreement but that plan was subsequently assumed by Defendants, Equicor–Equitable HCA Corporation and Equicor Health Plan, Inc. (hereinafter collectively Equicor).

As required by the HMO agreement, Mr. McGee notified Dr. Jon Kardatzke's office of the accident. Dr. Kardatzke, a general practitioner in Wichita, served as Mr. McGee's "primary plan physician"[1] under the contract. Dr. Kardatzke was out of the country at the time, but personnel in his office told Mr. McGee that he need not communicate with them further because they would stay abreast of the situation.

Meanwhile, several specialists provided care for Ms. McGee at Wesley which Dr.

---

**1.** The primary plan physician is "a duly licensed doctor of medicine or osteopathy who is a member of one of the participating physician group practices engaged by [Equicor] to provide medical services to Members" and who is "primarily responsible for the care of a Subscriber or Dependent with respect to a particular illness or injury." The participant is entitled to Medical Services provided by the plan so long as they are performed, prescribed or directed by a plan physician.

Kardatzke retroactively approved upon his return. Because Dr. Kardatzke lacked the necessary qualifications to provide specialized treatment for Ms. McGee, he deferred heavily to the advice of Dr. Philip Mills, a physiatrist who served as associate medical director of Wesley's cranial-spinal recovery unit (CSRU) and as Wesley's medical director of rehabilitation services.[2]

As a result of her injuries, Ms. McGee remained comatose for a period of time following the accident but gradually regained higher levels of consciousness. In late June 1987, Mr. McGee sought his daughter's transfer from the Wesley special care unit to Dr. Mills' direct care at the CSRU. Dr. Mills initially indicated the CSRU would benefit Ms. McGee but reversed his position several weeks later since her cognitive functions remained at a level he considered too low for his unit.

Mr. McGee commenced an independent search for alternative rehabilitative care outside the HMO coverage area and soon focused on Meadowbrook Hospital, a specialized treatment facility for head injuries in Gardner, Kansas. Mr. McGee also investigated alternative insurance sources when questions arose about the extent of coverage provided by Equicor's plan. At the time, Cessna's health benefit option allowed Mr. McGee to switch from the HMO to a standard indemnity plan offered by Aetna Insurance Company. Although Aetna would have paid for Ms. McGee's rehabilitation, Mr. McGee declined the plan since it capped benefits at a lifetime maximum of $250,000. Mr. McGee felt this sum would not adequately cover his daughter's future medical needs.

**2.** Dr. Mills was not affiliated with the HMO.

**3.** Dr. Mills reversed his opinion on what care Ms. McGee should receive several times between June and October 1989. For instance, he reported to Aetna that she required long-term rehabilitation which Meadowbrook, unlike Wesley, could provide. He did not recommend a nursing home during a September 16, 1987, conversation with Aetna because "he felt it would destroy Rachel's potential."

**4.** Dr. Mills wrote Dr. Kardatzke on September 23, 1987, stating:

Dr. Kardatzke notified Equicor's medical director of Mr. McGee's desire to place his daughter in Meadowbrook because it provided an integrated "team approach" to rehabilitative services for head injured patients. However, both Drs. Mills and Kardatzke balked at Mr. McGee's proposal. Instead, they preferred that Ms. McGee remain in a local skilled nursing facility for an interim period until she developed enough responsiveness to benefit from Dr. Mills' CSRU or other rehabilitative services.[3] Mr. McGee, who previously visited several proposed institutions on the advice of the Kansas Head Injury Association, opposed the nursing facilities since they provided rehabilitative therapy only on a contract basis. He insisted Ms. McGee receive the "team" rehabilitation approach offered by Meadowbrook or the CSRU.

Dr. Kardatzke eventually recommended that Ms. McGee enter the CSRU under Dr. Mills' direct supervision without an intermediate stay in a local nursing home. Equicor agreed to at least sixty days coverage at the CSRU beginning in August. The multidiscipline program included physical therapy, speech therapy, occupational therapy and recreational therapy.

However, over the course of the first month the relationship between Dr. Mills and Mr. McGee deteriorated. Dr. Mills advised Mr. McGee that his CSRU would retain his daughter for the remainder of the sixty day period but then "she would have to leave." He added that his unit was not equipped to handle Ms. McGee's slow progress. Instead, he recommended Ms. McGee enter a coma arousal program with integrated team rehabilitation.[4] However,

[Rachel] has had improved tone during her stay as well as improved tracking and is responding more consistently to stimulae. She would thus be a candidate for a coma arousal program. Such a program would provide continuous stimulation and maximum opportunity for improvement. We must avoid joint contractures and skin breakdown. *This type of facility would require monthly monitoring and integrated teaming.* (Emphasis added.) Two members of Dr. Mills' team also recommended long-term therapy for Ms. McGee, stating on her discharge evaluation summary "dismiss to long term closed head injury facility"

Dr. Mills reversed his position again less than three weeks later, stating he no longer felt "a coma arousal center would be of any benefit nor could [he] recommend this type of unproven treatment." [5]

Meanwhile, Equicor and Mr. McGee exchanged a series of telephone calls and letters. Mr. McGee's attorney made a formal demand to Equicor for preauthorization of Ms. McGee's care in what Plaintiff loosely referred to as a "coma arousal program," [6] specifying Meadowbrook as a suitable facility. However, Equicor's medical director responded that Equicor regarded coma arousal programs as experimental and unproven, and warned Mr. McGee during an October 9, 1987, telephone conversation if he moved his daughter without the plan physician's consent, any subsequent treatment would not be covered. Equicor reiterated that Dr. Kardatzke, who coincidentally served as medical director of one of the suggested Wichita nursing facilities, believed a nursing home was adequate for Ms. McGee's needs.

Nevertheless, Mr. McGee transferred his daughter to Meadowbrook on October 12, 1987, without further approval of either Drs. Mills or Kardatzke.[7] Four days later, Mr. McGee received written confirmation of Equicor's position denying coverage. Mr. McGee's attorney immediately filed a grievance with Equicor, asserting they had wrongfully denied coverage for Ms. McGee's "special care and treatment." Although Equicor stood by their decision, they nonetheless offered Mr. McGee "a special additional grievance procedure." Instead of pursuing the offer, Mr. McGee filed suit.

During her stay at Meadowbrook Ms. McGee's condition improved significantly. She progressed from a marginally conscious state to a cognizant level where she was once again able to feed herself, communicate on a limited basis, and walk with some assistance. She also became ambulatory with the use of an electric wheelchair.

### DISTRICT COURT'S FINDINGS

In reaching its decision, the district court turned to the language of the health care agreement that Cessna, as plan administrator, provided Mr. McGee. In short, subject to various exceptions, limitations and exclusions, the "comprehensive prepaid program" promised to pay for general care customarily provided by hospitals in the HMO service area if directed by the plan physician. Conversely, the plan excluded coverage for services not authorized by the plan physician or for services obtained outside the coverage area absent prior special authorization. The plan provided extended care services for inpatients at skilled nursing facilities authorized by the plan physician, limited "short term" rehabilitative services and other "medically necessary" services not specifically excluded by the agreement.

and "[r]ecommend twice daily physical therapy in ongoing long term rehab facility to maximize functional return."

5. In a letter from Dr. Mills to Equicor's medical director dated October 12, 1987, he recommended that Ms. McGee "stay on the CSRU rehab program for a total of six months, and then evaluate her status to see if any significant progress was being made to justify continued intensive rehab over good nursing care."

6. Expert testimony elicited at trial described a "coma arousal program" as an experimental and unproven treatment designed to stimulate the sensory organs of patients in a persistent vegetative state in order to arouse them from a coma. Although both parties referred to a coma arousal program during Ms. McGee's care, the trial court found this description was a misnomer since she was conscious prior to her transfer to Meadowbrook. Based on explanations from several specialists at trial, the district court determined Ms. McGee did not require a coma arousal program, but rather, what was more properly described as long-term rehabilitative care.

7. Dr. Mills' indecision continued up to the time Mr. McGee transferred Ms. McGee to Meadowbrook. In Ms. McGee's medical records for this date Dr. Mills stated that due to her improvement in the last two weeks he had approved an additional month's rehabilitation services for her at Wesley's CSRU. However, "[p]atient's father felt we had nothing to gain by this and moved patient to Meadowbrook. Originally I felt this might be a good plan but since reviewing literature and discussing [it] with various neurologists ... I believe this to be an unproven treatment program. In fact, data suggests no benefit whatsoever."

Exclusion number 17 precluded "[l]ong-term physical therapy and rehabilitation services" and exclusion number 18 prohibited coverage for "[e]xperimental medical, surgical or other experimental health care procedures." However, the copy of the agreement supplied to Cessna and later delivered to Mr. McGee mistakenly contained an endorsement deleting the exclusion for long-term physical therapy and rehabilitation services.[8]

The primary dispute at trial centered on the parties' interpretation of Section H of the Benefit Schedule, which read:

Prescribed short-term physical therapy and other short-term rehabilitation services for medical conditions are provided on either an outpatient or inpatient basis. Short-term rehabilitation services are limited to those services which, in the judgement of the Plan Physician, can be expected to result in significant improvement of the Member's condition within a period of two months.

The district court rejected Equicor's arguments that Section H limited short term rehabilitation to sixty days. It agreed with Mr. McGee that the provision did not clearly limit the plan physician's authority to approve an additional two months of rehabilitation after the first sixty days of rehabilitation were completed. The district court held that Equicor's policy granted coverage so long as the plan physician made a predetermination every sixty days that additional treatment would result in substantial improvement in Ms. McGee's condition in the following two months. However, the district court found the contract did not provide "long-term" rehabilitative coverage.

In ruling that Equicor wrongfully denied Mr. McGee coverage for the first two months of his daughter's stay at Meadowbrook, the district court warned that where an HMO policy delegates such wide discretion to a plan physician, "then the insurance company will have to accept the risk of the fickleness of either the plan physician or the person to whom the plan physician delegates the care and treatment of the insured." Finding that Mr. McGee reasonably relied on Dr. Mills' original recommendation that Ms. McGee transfer to a facility such as Meadowbrook; that such treatment was medically necessary; and that Meadowbrook was not experimental or unproven for a patient in her condition, the district court held that Dr. Mills' subsequent reversal of his position simply came too late and was unreasonable.

The district court denied Mr. McGee coverage beyond the first two months at Meadowbrook, however. It explained that Mr. McGee's "unilateral action of moving Rachel to Meadowbrook" severed relations with the plan physician and therefore prevented the physician from making the necessary predetermination of significant improvement as required under Clause H. As a result, the district court held that those rehabilitative services obtained at Meadowbrook beyond the first sixty days were not authorized, and hence, not a covered benefit.

Nevertheless, applying the five-part test from *Gordon v. United States Steel Corp.*, 724 F.2d 106, 109 (10th Cir.1983), the district court awarded Mr. McGee costs, attorney's fees and prejudgment interest totaling $76,363.31.

While we find some of the district court's findings clearly erroneous, we nevertheless agree the district court reached a correct result. We arrive at this conclusion "because we can affirm on any grounds that find support in the record," *Colorado Flying Academy, Inc. v. United States*, 724 F.2d 871, 880 (10th Cir.1984), *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986), "even where the [district] court reached its conclusions from a different or even erroneous course of reasoning." *Cayce v. Carter Oil Co.*, 618 F.2d 669, 677 (10th Cir.1980); *see also Miller v. City of Broken Arrow, Okl.*, 660 F.2d 450, 456

---

**8.** Endorsement MI–012–064–1286–G stated "[t]he group Medical and Hospital Service Agreement ('Agreement') to which this Endorsement is attached and incorporated therein, is hereby amended as follows: ATTACHMENT A, EXCLUSIONS, is amended to read as follows.... 17. (Delete)."

(10th Cir.1981), *cert. denied,* 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982).

## STANDARD OF REVIEW

The parties disagree on the standard of review we should apply in determining the extent of health care benefits available under Equicor's health care contract. Mr. McGee argues that ERISA requires this court to construe the terms of the health agreement under a *de novo* standard, applying "the same well-established rules" of law Kansas courts apply to the construction of insurance contracts. In short, Mr. McGee asserts that insurance contracts are typically adhesion contracts and where a provision of the agreement is ambiguous, the uncertainty must be resolved against the insurer. Furthermore, citing *United States Fidelity & Guar. Co. v. Group Health Plan,* 131 Mich.App. 268, 345 N.W.2d 683, 685 n. 1 (1983), he contends that although " 'HMOs are not (traditionally defined) insurance companies, . . . the same contract construction rules apply.' "

Equicor contends where health benefits are contractually conditioned upon the primary plan physician's exercise of medical judgment, we must apply the abuse of discretion standard with respect to the plan physician's determination of necessary medical benefits.[9]

While Equicor acknowledges the court may review interpretation of the contract terms de novo, Equicor argues the district court impermissibly relied on rules of insurance law when it interpreted the contract and resolved ambiguities against the health care provider. Equicor claims insurance principles are not applicable because the language in Section H of the agreement was not drafted by Equicor, but instead was copied from federal regulations governing basic health services provided by HMOs under 42 CFR § 417.101(a)(2)(iii).

Furthermore, Equicor asserts that HMOs are not indemnity insurance companies under Kansas law, and therefore are not governed by the general rules and regulations applicable to standard insurance companies.

The district court noted "that 'ERISA abounds with the language and terminology of trust law,' " and announced " 'that a denial of benefits challenged under § 1132(a)(1)(B) *is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan'* " (quoting *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110, 115, 109 S.Ct. 948, 954, 956, 103 L.Ed.2d 80 (1989) (emphasis added)). Furthermore, the district court acknowledged it must " 'construe terms in trust agreements *without deferring to either party's interpretation,' " id.* (quoting *Bruch,* 489 U.S. at 112, 109 S.Ct. at 955 (emphasis added)), and in accord with "common sense canons of contract interpretation." *Id.* (quoting *Burnham v. Guardian Life Ins. Co. of America,* 873 F.2d 486, 489 (1st Cir.1989)).

■ Acknowledging it made no distinct finding that plan physicians are fiduciaries with discretionary authority under the ERISA plan, the district court held that under general rules of contract interpretation an agreement that grants a plan physician such broad discretion is subject to judicial scrutiny only if the physician's determination as to benefits is unreasonable.[10] "[T]he bottom line," according to the district court, is this standard is identical to the abuse of discretion standard mandated by *Bruch.* To the extent the district court reviewed de novo the terms of the health agreement and applied a standard of review equivalent to the abuse of discretion

---

**9.** However, Mr. McGee contends the abuse of discretion standard is inappropriate because Cessna, in its capacity as plan administrator, exercised no discretion under the policy.

**10.** The district court relied upon the RESTATEMENT (SECOND) OF CONTRACTS § 228 and comment (a) (1981), and explained that "[i]t is a general rule of contract interpretation that if one party's duty to perform is conditioned on its satisfaction with the performance or happening of a conditioned event, then that party's determination that the conditioned event has not occurred is subject to review by the court if unreasonable."

standard to the plan physicians' exercise of medical judgment, we agree this is the proper standard of review.

    Equicor does not challenge this reasoning. However, Equicor argues the district court improperly afforded deference to Mr. McGee's interpretation of the contract. As Equicor correctly points out, the district court, citing *Dronge v. Monarch Ins. Co.*, 511 F.Supp. 1, 4 (D.Kan.1979), held "the insured's objective reasonable belief of what services are covered *should be given deference.*" Equicor argues the district court's application of the *contra proferentem* rule—the practice of construing ambiguous terms against the insurer—runs counter to the mandate in *Bruch* that courts construe disputed language in ERISA benefit plans "without deferring to *either* party's interpretation." [11] *Bruch*, 489 U.S. at 112, 109 S.Ct. at 955 (emphasis added); *see also Brewer*, 921 F.2d at 154.

We need not determine whether or to what extent the *contra proferentem* rule affected the district court's decision. We take no position in this case as to whether application of the *contra proferentem* rule to contracts governed by ERISA is proper. Because we find the contract between Equicor and Mr. McGee was not ambiguous, application of this rule of construction would have no impact on the outcome of our decision.

In summary, we review the terms of the health agreement and Equicor's denial of benefits de novo, but we apply the abuse of discretion standard to the plan physician's exercise of medical judgment in determining Ms. McGee's eligibility for benefits. *See Bruch*, 489 U.S. at 115, 109 S.Ct. at 957. This is the identical standard applied by the district court. In other words, we will overturn an exercise of discretion only if unreasonable.

## DISCUSSION

We address the remaining issues in four parts. First, whether the Equicor health plan limits rehabilitation to a maximum of

---

**11.** The circuits are split on this issue. The Ninth Circuit held the *contra proferentem* rule is applicable to ERISA plans, arguing that *Bruch* pertained solely to the standard of review applicable to "a plan administrator's interpretation of plan provisions." *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 540–41 (9th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990). The court reasoned that *Bruch* remained silent as to "the ordinary principles of construction according to which courts and administrators alike should arrive at their interpretations." *Id.* The Ninth Circuit rejected federal preemption arguments. It explained that although ERISA's § 1144(a) provides sweeping preemption "of 'any and all State laws insofar as they may now or hereafter *relate to any employee benefit plan*'.... Congress also enacted an 'insurance saving clause' in § 514(b)(2)(A), which states that with one exception not relevant here, 'nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which *regulates insurance*....'" *Id.* at 539 n. 8 (citing 29 U.S.C. § 1144(a) and 1144(b)(2)(A)) (emphasis added). *See also Retirement Fund Trust v. Franchise Tax Bd.*, 909 F.2d 1266, 1274 (9th Cir.1990) (noting that "[a]lthough a state law that intrudes only indirectly on [an ERISA plan] may be preempted, (citations omitted) a state law of general application with only a 'tenuous' effect on an ERISA plan is not."). However, the Eighth Circuit expressly rejected *Kunin* stating the *contra proferentem* rule "does not regulate insurance and is preempted by ERISA." *Brewer v. Lincoln Nat'l Life Ins. Co.*, 921 F.2d 150, 153 (8th Cir. 1990), (arguing the *contra proferentem* rule of construction "is nothing more than a specific application of general state contract principles and was not specifically designed for the insurance industry"), *cert. denied*, — U.S. —, 111 S.Ct. 2872, 115 L.Ed.2d 1038 (1991).

Although our court has not addressed this specific question, we have held that "[u]nless otherwise encompassed in the saving clause, any state law relating to any ERISA plan is preempted," *Metropolitan Life Ins. Co. v. Hanslip*, 939 F.2d 904, 906 (10th Cir.1991), but "ERISA does not preempt claims that are only tangentially involved with a benefit plan." *Settles v. Golden Rule Ins. Co.*, 927 F.2d 505, 509 (10th Cir.1991). *See also Ingersoll–Rand Co. v. McClendon*, — U.S. —, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990) (explaining that "'[a] law "relates to" an employee benefit plan ... if it has a connection with or reference to such a plan.' Under this 'broad common-sense meaning,' a state law may 'relate to' a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect." (Citations omitted.)) We note also that the Eleventh Circuit recently held that even though an HMO may be subject to the same laws as state insurance companies this "does not mean that it is in the 'business of insurance' for the purpose of the ERISA savings clause." *O'Reilly v. Ceuleers*, 912 F.2d 1383, 1389 (11th Cir.1990).

sixty days; second, whether Equicor wrongfully denied coverage for the first two months of Ms. McGee's care at Meadowbrook; third, whether Mr. McGee was entitled to coverage for the remaining twenty three months; and fourth, whether the district court erred in awarding Mr. McGee attorney's fees and costs.

### I

We review the terms of Equicor's health care agreement de novo, *Bruch,* 489 U.S. at 115, 109 S.Ct. at 956, to determine whether the plan limits rehabilitation benefits to a maximum of sixty days. The district court held the health agreement does not impose such a limit.[12] We agree.

Equicor claims the disputed language of Section H, limiting short term rehabilitation "to those services which, in the judgement of the Plan Physician, can be expected to result in significant improvement of the Member's condition within a period of two months," clearly limits rehabilitation benefits to sixty days. We disagree. No language in the contract limits coverage to a specific *period of time.* Instead, the provision only limits the availability of coverage by a *condition* that the physician make a predetermination that such services will result in significant improvement of the patient's condition *within a fixed period.* We therefore read Section H as providing coverage for rehabilitative services *for so long as the condition is continually met.*

Equicor argues that the "Summary of Benefits" booklet that accompanied the health contract clearly limits short term rehabilitation coverage to "60 consecutive days per incident." However, Equicor invites us to ignore its own disclaimer on the last page of the summary, which unequivocally states "[i]f any information provided herein is contrary to the group or individual medical and hospital service agreement ... said agreement ... shall apply." We find the benefits summary, insofar as it purports to create a sixty day limit on rehabilitative services, creates an ambiguity between the contract and the benefits summary. Therefore, the contractual language—by operation of Equicor's own disclaimer—controls. *See also Nachwalter v. Christie,* 805 F.2d 956, 960 (11th Cir.1986) (citing *Johnson v. Central States, S.E. & S.W. Areas Pension Funds,* 513 F.2d 1173, 1174–75 (10th Cir.1975) (benefits may not be enforced according to a booklet and letter that are inconsistent with the terms of a written ERISA pension plan)).

Equicor demonstrated its ability to clearly limit benefits in companion provisions of the health agreement with such phrases as "is limited to" and "up to twenty ... visits ... per contract year." If Equicor desired to limit rehabilitative services to sixty days per incident, it should have incorporated similar specific language into Section H, expressly indicating a maximum term of coverage. Simply because Equicor injected language from 42 C.F.R. § 417.101(a)(2)(iii) into its contract terms does not immunize the agreement from judicial interpretation. While the federal rules regulate services provided by an HMO, they do not generally dictate the precise language HMO contract drafters must use. Instead, the regulations require only that an HMO's written description of benefits and coverage "be written so that it can be easily understood by the average person who might enroll." 42 C.F.R. § 417.107(c)(1) (1990). If, as Equicor's regional medical director testified, the federal language could have been written "better," the health care provider invited its own lawsuit by failing to clearly express its intent within the contract.

Before Mr. McGee moved his daughter to Meadowbrook, Equicor notified him that it regarded Section H as limiting rehabilitative care to sixty days. However, the notice was an ineffective means to incorporate such a limit. Section XX(E) of the agreement states Equicor "may adopt reasonable policies, procedures, rules *and interpretations* which are not inconsistent with the terms of the Agreement ... *pro-*

---

**12.** It is not clear whether the district court found the agreement ambiguous or whether it reached its conclusion because the contract terms unequivocally created coverage beyond sixty days. In any event, we find the agreement unambiguous.

*vided that these are published prior to their implementation and that they have been filed with the Kansas Commissioner of Insurance."* (Emphasis added.) We find no arguments, findings or evidence in the record that indicates Equicor's interpretation was in fact published or filed with the Commissioner. Where a "plan document unambiguously addresses" the procedure to be used, "the plan is contractually bound to honor that procedure as it existed when" the dispute arose. *Pratt v. Petroleum Produc. Management, Inc.,* 920 F.2d 651, 662 (10th Cir.1990). Therefore, Equicor's notice to Mr. McGee was ineffectual.

■ We are mindful that the objective in construing a health care agreement, as with general contract terms, is to ascertain and carry out the true intention of the parties. However, we do so giving the language its common and ordinary meaning *as a reasonable person in the position of the HMO participant,* not the actual participant, would have understood the words to mean. *See Bruch,* 489 U.S. at 112, 109 S.Ct. at 955 (no deference to either party's interpretation). Under general contract law principles, "words cannot be written into the agreement imparting an intent wholly unexpressed when it was executed." *Wood River Pipeline Co. v. Willbros Energy Servs. Co.,* 241 Kan. 580, 738 P.2d 866, 871 (1987). Therefore, we cannot in good conscience insert a sixty day coverage limit where the health agreement limits services only by a condition. To do so would thwart the congressional purpose of ERISA's disclosure provisions which are designed to ensure "that 'the individual participant knows exactly where he stands with respect to the plan'...." *Bruch,* 489 U.S. at 118, 109 S.Ct. at 958.

## II

Next, we consider whether Equicor wrongfully denied Mr. McGee health benefits for the first two months of his daughter's rehabilitative care. To impose liability on Equicor, we must find Ms. McGee's rehabilitative treatment at Meadowbrook was "medically necessary"; was not "ex-

perimental or unproven"; and the plan physician "performed, prescribed or directed" the services in dispute. Because the district court's fact findings regarding these liability criteria are not clearly erroneous, we uphold its decision that Mr. McGee was entitled to coverage for the first two months of rehabilitative services at Meadowbrook.

■ As we noted earlier, where the health care agreement gives the plan physician discretion to determine eligibility for benefits, we review the physician's exercise of that discretion under an abuse of discretion standard. *See Bruch,* 489 U.S. at 115, 109 S.Ct. at 956; *see also Woolsey v. Marion Labs., Inc.,* 934 F.2d 1452, 1457 (10th Cir.1991) (for actions brought under 29 U.S.C. § 1132, a court of equity should not substitute its judgment for that of a trustee who exercises a discretion vested in them by the instrument under which they act). However, we review the trial court's findings of fact that arose out of the physician's exercise of discretion under a clearly erroneous standard. We may not declare the trial court's findings "clearly erroneous unless, after a review of the entire record, we are left with a definite and firm conviction that a mistake has been made." *Higgins v. State ex rel. Okla. Employment Sec. Comm'n.,* 642 F.2d 1199, 1202 (10th Cir.1981). We are not left with such a conviction here.

### A

■ The record clearly supports the trial court's finding that the type of care Ms. McGee received at Meadowbrook was "medically necessary" for purposes of the contract. Evidence introduced at trial indicated that Meadowbrook provided an integrated "team approach" for the rehabilitation of severe head injured patients. The program included the services of a team of certified therapists dedicated solely to the facility, who worked as a unit in rendering medical care under the supervision of a physiatrist. Among the team members were occupational therapists, speech therapists, physical therapists, recreational therapists and nurses.

Furthermore, Dr. Mills concluded in a letter to the primary plan physician on September 23, 1987, that Ms. McGee required "monthly monitoring and integrated teaming." He made similar remarks in a letter to Aetna Insurance Company and individually to Mr. McGee himself. Hospital records also indicated Dr. Mills had no objection to Meadowbrook. A "transfer summary" prepared by Dr. Mills dated August 21, 1987, contained substantially the same information that appeared in his subsequent letters to Dr. Kardatzke and Aetna. The summary, as well as a medical record entry dated August 31, 1987, noted that "the type of program needed by Rachel would be a long-term program." This is precisely the type of care Meadowbrook provided.

Likewise, a "team conference summary" dated August 24, 1987, reflected Ms. McGee's good progress and noted Dr. Mills would seek an extension for rehabilitation services. Therapists on Dr. Mills' rehabilitation team also recommended Ms. McGee's dismissal "to a long term closed head injury facility." Furthermore, an expert in head trauma rehabilitation testified that the care Ms. McGee received at Meadowbrook was medically necessary for her injuries at the time. Therefore, ample evidence exists from which the trial court could find Dr. Mills believed and led others to believe Ms. McGee required the long-term care provided by Meadowbrook. We cannot declare the district court's findings clearly erroneous.

### B

■ The trial court's conclusion that the treatment offered by Meadowbrook was not "experimental and unproven" is also supported by the record and essentially unchallenged on appeal by Equicor. Experts testified that Meadowbrook provided the type of rehabilitative care Ms. McGee required. Evidence also suggests the treatment available at Meadowbrook was in many respects similar to services provided at Wesley's CSRU which Equicor approved for sixty days. For instance, when Mr. McGee told Dr. Kardatzke the two programs were so similar that he would accept the CSRU in lieu of Meadowbrook, Dr. Kardatzke responded by recommending Ms. McGee's admission to the CSRU. Furthermore, it is clear Dr. Mills should have known that Meadowbrook's treatment was not experimental or unproven since he had referred other patients there in the past.

The trial court found Meadowbrook provided the precise long-term "team integrated" rehabilitation for head injury patients that Dr. Mills' originally recommended for Ms. McGee. The trial court also held that Dr. Mills' subsequent renunciation of Meadowbrook as "unproven" was based on the unreasonable conclusion that Ms. McGee required a "coma arousal" program, which unlike Meadowbrook's long-term rehabilitative care, remained experimental and unproven.

Given the facts that appear in the record, we cannot say the trial court's findings on this issue are clearly erroneous.

### C

■ Equicor argues Ms. McGee's transfer to Meadowbrook was not authorized by either Drs. Kardatzke or Mills, and therefore is not a covered benefit under the health plan. The district court concluded Dr. Mills initially recommended Meadowbrook as an appropriate long term facility and his subsequent reversal of position was "unreasonable." Equicor attacks the district court's conclusion on two points.

First, Equicor suggests Dr. Mills originally recommended that Ms. McGee undergo a "coma arousal" program, not because of his professional judgment, but rather, only at Plaintiff's specific "request and insistence." Second, Equicor claims Mr. McGee did not adversely rely on Dr. Mills' original recommendation since Defendants responded negatively to Mr. McGee's demand letter for preauthorization of Ms. McGee's care within the time schedule dictated by Plaintiff himself. Mr. McGee counters he had no choice but to rely on Dr. Mills' original recommendation to transfer his daughter, because Dr. Mills indicated he no longer wished to care for her after September.

Again, the clearly erroneous standard guides our decision. If there are any tenable facts that make the district court's account of the evidence plausible "in light of the record viewed in its entirety," we may not reverse. *Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* We find the district court's account of the facts rational, and we refuse to duplicate the role of the factfinder. *See id.* at 573, 105 S.Ct. at 1511.

We reject Equicor's argument that a physician of Dr. Mills' stature and experience would cast aside his medical judgment and recommend treatment to another physician or insurance carrier only at Plaintiff's specific request and insistence. While Dr. Mills may have wanted the "family away from him," neither the evidence nor the trial court's findings indicate his judgment was improperly swayed. Evidence introduced at trial and Dr. Mills' own testimony reveal he believed Ms. McGee required long-term rehabilitation such as that provided by Meadowbrook. In his letters to Aetna and Dr. Kardatzke, Dr. Mills' merely *described* the long-term care as a "coma arousal program" at Mr. McGee's specific request. We therefore find Equicor's first argument without merit.

We agree with the trial court's perception that Dr. Mills "prescribed or directed" Ms. McGee's transfer to Meadowbrook. Sufficient evidence exists in the record to imply Mr. McGee relied on Dr. Mills' original recommendations and correspondence indicating Meadowbrook was an appropriate facility for his daughter.

For instance, Dr. Mills noted in a telephone conversation and a follow-up letter with Aetna that Ms. McGee required the type of long-term, team integrated care Meadowbrook provided. He sent a similar letter to Dr. Kardatzke, indicating Ms. McGee required long-term rehabilitation, and noted in Wesley's hospital records that he did not object to Meadowbrook. Members of Dr. Mills' team made similar remarks in Ms. McGee's discharge evaluation.

While Equicor notified Mr. McGee by telephone on October 9, 1987, that Dr. Kardatzke believed a nursing home was still the appropriate treatment for his daughter, and that Equicor deemed "coma arousal centers ... experimental and unproven," that notification conflicted with Dr. Mills' earlier recommendations. Mr. McGee could reasonably believe Dr. Mills spoke for the primary care physician where Dr. Kardatzke previously stated he would support Dr. Mills if he favored a particular program. Furthermore, Equicor's follow-up letter to the October 9 telephone conversation was postmarked *after* Ms. McGee went to Meadowbrook and focused primarily on whether "coma arousal programs" were experimental. Neither the letter nor the record mentions Dr. Mills' changed attitude toward Meadowbrook's program until the same day Ms. McGee left the CSRU.

The trial court found Dr. Mills' last-minute change of position "unreasonable" since he had enough information that he should have known Meadowbrook provided non-experimental long-term rehabilitation services for patients with a cognitive level equivalent to Ms. McGee's.

After reviewing the record, we agree Dr. Mills' change of position on the same day Mr. McGee transferred his daughter simply came too late. Mr. McGee's reliance on Dr. Mills' original recommendation of a long-term rehabilitation facility was justifiable, particularly where Dr. Mills assumed the role of plan physician and previously indicated a nursing home might "destroy Rachel's potential." As the trial court noted, where Equicor delegates such broad discretion in its health care program it must accept the "fickleness" of the plan physician. We cannot say the trial court's reasoning is clearly erroneous on this point.

In summary, the district court's findings that Ms. McGee's treatment at Meadowbrook was "medically necessary," not "experimental or unproven," and the plan physician "prescribed or directed" services at Meadowbrook for the first two months of her stay are not clearly erroneous. We

therefore uphold the district court's decision that Equicor wrongfully denied coverage for Ms. McGee's first two months at Meadowbrook.

### III

■ Next, we discuss whether Equicor wrongfully denied Mr. McGee coverage for the remaining twenty-three months his daughter spent at Meadowbrook. The requisite inquiry here is whether Mr. McGee continually satisfied the condition in Section H of the contract making rehabilitation benefits available only so long as the plan physician determined in advance such treatment would result in Ms. McGee's significant improvement within each sixty-day period she remained at Meadowbrook.

The district court concluded Mr. McGee's "unilateral act" of moving his daughter to Meadowbrook severed relations with the plan physician and therefore prevented the plan physician from making the necessary predetermination of significant improvement. As a result, the district court found the contractual condition necessary for continued benefits was not satisfied and held Equicor owed no coverage beyond the initial sixty days at Meadowbrook. We agree with this result.[13]

■ It is a basic rule of insurance law that the insured carries the burden of showing a covered loss has occurred and the insurer must prove facts that bring a loss within an exclusionary clause of the policy. *M.H. Lipiner & Son, Inc. v. Hanover Ins. Co.*, 869 F.2d 685, 687 (2d Cir. 1989); *Texas Eastern Transmission Corp. v. Marine Office–Appleton & Cox Corp.*, 579 F.2d 561, 564 (10th Cir.1978); *Milliken v. Fidelity & Casualty Co.*, 338 F.2d 35, 41 (10th Cir.1964) (noting in a footnote the same rule applies in Kansas). Although the health coverage here involves prepaid HMO services rather than traditional indemnity coverage, we believe the same principle applies. The burden rests upon the HMO participant, not the health care provider, to show entitlement to benefits under a prepaid health plan. Mr. McGee failed to meet this burden.

■ In fact, Mr. McGee concedes on appeal the primary plan physician never made the essential predetermination of significant improvement required for benefits under the rehabilitative services section of the contract. From our perspective, that failure is fatal to Mr. McGee's demand for rehabilitation benefits beyond the initial sixty days his daughter remained at Meadowbrook. The predetermination requirement of section H is clear. Equally explicit is the health agreement's notice that "benefits are available only … if, and to the extent that, they are provided, prescribed or directed by a Plan Physician." Without the required predetermination, we cannot say the plan physician "prescribed or directed" Meadowbrook's continued services.

■ Nevertheless, Mr. McGee argues the plan physician had a duty to conduct the predetermination examination, and once Dr. Mills withdrew from the case, "the ball … was in [Dr.] Kardatzke's court" to either withdraw and refer the matter to another physician, or to associate with another physician competent in closed head injuries. Dr. Kardatzke did neither. Mr. McGee insists where the primary plan physician breached this responsibility the court has no alternative but to substitute in his place the judgment of a hypothetical, reasonable and competent physician to satisfy the predetermination requirement. We disagree.

It is apparent from the record that Mr. McGee terminated his relationship with Dr. Kardatzke despite knowing that continued services hinged upon the primary plan phy-

---

13. While we agree with the result reached by the district court, we disagree with the district court's conclusion that Mr. McGee "unilaterally" moved his daughter to Meadowbrook. As the parties point out, such a conclusion is irreconcilable with the district court's earlier determination that Dr. Mills led Mr. McGee to believe Meadowbrook was an appropriate program for his daughter. Therefore, the trial court's finding that Ms. McGee's transfer was the product of a unilateral act cannot stand. However, because we find Mr. McGee effectively severed relations with Dr. Kardatzke after his daughter's transfer, this issue has no effect on the outcome of the case.

sician's predetermination of benefits every sixty days. Dr. Kardatzke testified that once Ms. McGee transferred to Meadowbrook, he had no control whatsoever over Ms. McGee's care. In effect, he explained, his role as primary plan physician was usurped. Our review of the record indicates Dr. Kardatzke never examined or had direct contact with Ms. McGee after her transfer; Mr. McGee never again contacted him about his daughter's progress or benefits; and Meadowbrook never once consulted him regarding her treatment.

Nor did Mr. McGee ever consult Dr. Kardatzke about relinquishing the primary plan physician role. Evidence presented at trial indicates Mr. McGee knew Equicor's plan allowed him to change plan physicians. Although Equicor recommended that Mr. McGee attempt to work out his differences with Dr. Kardatzke, Mr. McGee still retained the absolute right to seek a plan physician more sympathetic to what he believed was appropriate care for his daughter. However, Mr. McGee never exercised that option. Instead, he continued to work with physicians outside the HMO coverage area and without Dr. Kardatzke's input.

Mr. McGee notes Meadowbrook issued Dr. Kardatzke regular written progress reports concerning Ms. McGee's care throughout her entire rehabilitation period, detailing her medical condition and progress in therapy. Mr. McGee suggests Dr. Kardatzke's acquiescence to these reports somehow constitutes an implied approval of his daughter's care at Meadowbrook. We disagree and decline to read the mere act of receiving reports in this situation as silent approval for Ms. McGee's continued care at a facility outside the HMO geographic area.

Equicor's health care agreement clearly states the physician must affirmatively make a predetermination every sixty days and specifically excludes "[s]ervices of non-participating providers, except for Emergencies, *or when authorized in advance by [Equicor] or a Plan Physician.*" (Emphasis added.) Neither Mr. McGee nor Meadowbrook sought or received Dr. Kardatzke's blanket approval for Ms. McGee's

care at Meadowbrook. Although Dr. Kardatzke agreed that progress reports indicated Meadowbrook provided "basically good care" for Ms. McGee, he still believed equally viable nursing facilities existed within the HMO geographic area.

Despite Equicor's letter reminding Mr. McGee "that it is necessary that the primary care physician be kept updated, and ... any communications should be handled through his office," Dr. Kardatzke received the reports only after he "made a very strong request" for them. Under these circumstances, we see no correlation between receiving progress reports for a patient no longer under Dr. Kardatzke's control and the affirmative act of making the required predetermination of benefits. In short, failure to obtain the primary plan physician's necessary predetermination under Section H of the contract terminated authorization for coverage of services at Meadowbrook beyond the first sixty days.

Equicor's denial of benefits was reasonably foreseeable. Equicor put Mr. McGee on notice the primary plan physician's predetermination was essential, warning that lack of the physician's consent to Meadowbrook would defeat coverage. Equicor notified Mr. McGee by telephone and letter in the late fall of 1987 that Dr. Kardatzke believed nursing facilities would provide the care Ms. McGee required. Equicor's admonitions, as well as the contract itself, clearly apprised Mr. McGee of the requirements for further coverage. Mr. McGee also understood that continued benefits were contingent upon the plan physician's predetermination of significant improvement because he testified at trial it was his "belief [they] could show significant progress...." Moreover, Equicor notified Mr. McGee on April 14, 1988, of its decision to deny coverage for charges submitted for Meadowbrook, not because it considered Meadowbrook experimental, but rather, because the "services [were] not authorized by a Primary Care Physician." While Equicor's notices were ineffective to deny benefits for the first sixty days at Meadowbrook, they did serve as a reminder that continued coverage required updated approval pursuant to section H. Equicor's

warnings apparently went unheeded, however. Instead of pursuing Dr. Kardatzke's approval, Mr. McGee pursued this lawsuit.

We cannot now provide the necessary predetermination that Mr. McGee knowingly elected not to pursue at the time the dispute arose. While it is readily apparent Mr. McGee sought the best possible care for his daughter, he was still obligated to work within the defined contractual borders of the HMO he elected to participate in. HMOs are not traditional insurance companies designed to indemnify participants for services they unilaterally select at any geographic location. Instead, HMOs such as Equicor provide comprehensive prepaid medical services within a defined geographic area, and with specific exceptions, only by participating medical professionals and facilities. The Equicor health plan made on-going rehabilitative services contingent upon periodic findings by the primary plan physician that patients might significantly improve from continued treatment within a fixed time period. We view the section H condition as a reasonable method for the primary plan physician to monitor a patient's progress, and a means to best manage future medical benefits available under the health plan. Participants who ignore such contractual obligations, however, do so at the risk of disqualifying themselves for benefits under their chosen health plan.

Granted, Dr. Mills' indecision may have initially confused Mr. McGee over what was the appropriate care for his daughter. However, Mr. McGee possessed viable options to alleviate the acknowledged problems and prevent a veto over Meadowbrook's services. He never exercised them. For example, Mr. McGee could have changed primary plan physicians. Mr. McGee also could have agreed to Dr. Mills' last minute proposal to keep Ms. McGee at the CSRU an additional month to determine if significant progress was made "to justify continued intensive rehabilitation over good nursing care at an extended facility." Likewise, he could have converted to a traditional indemnity insurance plan that agreed to cover Ms. McGee's rehabilitative

services at Meadowbrook. Dr. Mills urged Mr. McGee to pursue this option. Instead, Mr. McGee elected to remain with Equicor. To ensure coverage under the limited HMO plan, however, it was essential for Mr. McGee to adhere to the limits and conditions established by the health care agreement. That was not done. We refuse to redefine the contractual obligations of the parties to create coverage where none is due.

Furthermore, the retroactive examination and prognosis urged by Plaintiff faces additional barriers. It would require us to rely on hindsight, viewing Ms. McGee's significant improvement over a two-year period as if a competent physician would have made the same determination of her progress in advance. Mr. McGee's argument runs counter to the express terms of the Equicor contract. The health agreement clearly states rehabilitative services "are limited to those services which, in the judgement of the Plan Physician, *can be expected to result* in significant improvement ... within a period of two months." It does not indemnify participants for significant health improvements that actually occur whenever the required predetermination is not satisfied. Additionally, we are not competent to determine, as hypothetical physicians, at what point Ms. McGee's care might have been cut off had a physician actually been making the regular predeterminations throughout the rehabilitation period. We refuse to engage in such medical conjecture and therefore reject Plaintiff's arguments. We have no basis in law or contract that allows us to retroactively convert Ms. McGee's actual improvement into the predetermination Section H requires to ensure benefits.

Mr. McGee cites Dr. Kardatzke's retroactive approval of Ms. McGee's initial care after the accident as authority for this court to resort to a hypothetical physician's retroactive predetermination. Again, the health agreement undercuts Mr. McGee's argument. The agreement expressly permits health care services by other physicians in *emergency* situations, such as those services provided immediately after Ms. McGee's accident. It is unrealistic to

assume this exception automatically rolls over into approval for unlimited health services beyond the explicit terms of the health care agreement.

■ Our decision is guided, in part, by the nature of the action before us. This suit is not a malpractice action directed against Dr. Kardatzke, nor is he named as a party to the litigation. Our focus is solely on the benefits provided by Equicor under the HMO health plan and whether the named parties satisfied their contractual obligations under the agreement.[14] The district court made no findings concerning the plan physician's obligations under the agreement, nor does Mr. McGee specifically direct us to any evidence the district court was asked to make such findings. In the final analysis, we cannot say the district court's conclusion that Mr. McGee severed relations with the primary plan physician is incorrect, nor can we say Equicor acted unreasonably in denying benefits where Mr. McGee admits the required predetermination for benefits was not satisfied.

■ We expressly reject Mr. McGee's argument that Equicor's acts of extending medical benefits beyond its presumed coverage limits in previous unrelated cases—and that it was prepared to do so with Ms. McGee—induced reliance or created an implied-in-fact contract warranting coverage for Meadowbrook. While we agree that in certain situations the actions of one party may induce reliance or create contractual obligations, *see Zaccardi v. Zale Corp.*, 856 F.2d 1473, 1477 (10th Cir.1988), we decline to consider the argument here. To create an implied contract where the health provider agrees to extend coverage beyond the limits of the benefit period it expressly believes has expired would discourage HMOs or insurance companies from extending any benefits beyond their precise contractual obligations out of fear of creating contractual liability.

Both parties also advance lengthy arguments as to whether Equicor's health plan created long-term care by virtue of Equicor's mistake in deleting the long-term care exclusion from the health agreement. Because the required condition for extended rehabilitative services was not met, we need not address this issue.

Accordingly, we uphold the district court's decision that Equicor owed no benefits for those services provided by Meadowbrook beyond the first sixty days.

■ Alternatively, Mr. McGee contends if Equicor is not liable for coverage of his daughter's stay at Meadowbrook then Equicor should at minimum reimburse him for rehabilitative care at the nursing home rate.[15] Mr. McGee argues we may "safely assume" that if Ms. McGee was not transferred to Meadowbrook, then Equicor would nevertheless have had to pay for her

---

14. Two provisions in the Equicor health agreement warrant brief notice. First, the agreement states the relationship between Equicor and plan physicians is an independent contractor relationship and "Plan Physicians ... are not employees or agents of [Equicor]...." The agreement further cautions that "Plan Physicians maintain the physician-patient relationship with Members and are *soley responsible* to Members for all Medical Services." (Emphasis added.) The district court made no findings whether Dr. Kardatzke's role as plan physician constitutes a "medical services" function which would fall under this provision, or whether his role equates to an administrative function apart from normal medical services.

Second, the contract provides that "[i]f for any reason Plan Physicians fail to or are unable to render the services they have agreed to provide, [Equicor] agrees, while the individual continues to be a Member, to provide, arrange or to pay for services equivalent to those indicated in the Schedule of Benefits up to the date for which payment has been made by Group on behalf of each Member." We see no evidence these provisions were raised as issues by the parties. "This Court will generally not address issues that were not considered and ruled on by the district court." *Farmers Ins. Co. v. Hubbard,* 869 F.2d 565, 570 (10th Cir.1989) (citations omitted). Likewise, we refuse to do so here. While "ERISA explicitly authorizes suits against fiduciaries ... to remedy statutory violations, including breaches of fiduciary duty and lack of compliance with benefit plans," *Bruch,* 489 U.S. at 110, 109 S.Ct. at 953 (citation omitted), Mr. McGee never pursued these remedies.

15. The health agreement specifically includes benefits for general nursing care prescribed by the plan physician, as well as special duty nursing care and physical therapy when "medically necessary as part of inpatient care."

nursing care throughout the same period, particularly where the plan physicians indicated their preference for a nursing facility over Meadowbrook.[16] We disagree. Simply because the plan physicians believed nursing home care was adequate for Ms. McGee in October 1987 does not guarantee they would have maintained the same opinion two months later. Both physicians indicated a nursing facility might serve only as an interim facility until Ms. McGee regained higher cognitive functions that would enable her to benefit more from rehabilitation. It is apparent neither physician could predict how long Ms. McGee might remain in a nursing facility before undergoing a rehabilitation program. Again, we refuse to involve this court in such medical conjecture. We cannot in good conscience extend benefits where Mr. McGee severed relations with Dr. Kardatzke and thus prevented the primary plan physician from prescribing those services on an ongoing basis.

## IV

Finally, Equicor argues the trial court abused its discretion in awarding attorney fees to Mr. McGee. While we are fully aware that courts should not grant attorney's fees under ERISA as a "matter of course," reasonable fee awards are nevertheless discretionary in nature. 29 U.S.C. § 1132(g)(1); *Pratt*, 920 F.2d at 658; *Gordon v. United States Steel Corp.*, 724 F.2d 106, 108 (10th Cir.1983) (citations omitted). To find "that the district court

abused its discretion, we must have a definite conviction that the court, upon weighing relevant factors, clearly erred in its judgment." *Gordon*, 724 F.2d at 108. We have examined Equicor's arguments, as well as the trial court's reasoning, and harbor no such conviction here.

The district court adhered to the appropriate five-part test[17] in arriving at its decision that Equicor was "more culpable than the plaintiff," that Equicor had the ability to satisfy the award of attorney fees, and that Mr. McGee acted reasonably in this case to the extent he transferred his daughter to Meadowbrook on the plan physician's original advice. Furthermore, the district court found all participants in the HMO benefitted from the litigation because it resolved a dispute over the time limits for rehabilitative services under the plan, and thus this might deter other health plan providers from denying benefits in similar circumstances.

It is well established that "an appellate court plays a 'limited role' in reviewing a district court's award of attorneys' fees and costs, and deference is given to a district court's judgment on the matter, since the district court is in a better position to assess the course of litigation and quality of work." *Duran v. Carruthers*, 885 F.2d 1492, 1494 (10th Cir.1989). We have reviewed the record and cannot say the district court's view of the evidence is unreasonable or unsupported. Therefore, we

16. We reject the district court's findings as clearly erroneous to the extent the court found Mr. McGee transferred his daughter to Meadowbrook *after* Dr. Mills properly exercised his discretion in determining a nursing facility would be more appropriate treatment. Again, such a finding is irreconcilable with the trial court's earlier opinion that Dr. Mills unreasonably reversed his position on Meadowbrook at the time Ms. McGee was transferred. While Dr. Mills may have preferred general nursing facilities at the time of her transfer, the trial court found his reasons for opposing Meadowbrook were misguided, unreasonable, and his exercise of discretion simply came too late.

17. The primary factors the court must consider when granting costs and attorney fees to either party under 29 U.S.C. § 1132(g)(1) are:

(1) [T]he degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to personally satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.

*Gordon*, 724 F.2d at 109. Furthermore, we note the five *Gordon* factors are merely guidelines, and while courts need not consider each factor, no single factor should be held dispositive. *See Gray v. New England Tel. & Tel. Co.*, 792 F.2d 251, 258 (1st Cir.1986).

find the district court did not abuse its discretion in awarding attorney's fees.

## CONCLUSION

We uphold the trial court's decision that Equicor wrongfully denied Mr. McGee coverage for only the first two months of his daughter's rehabilitative care at Meadowbrook and find he is not entitled to alternative relief at the nursing home rate. The trial court's award of attorney's fees is sustained, but we deny Mr. McGee's request for attorney's fees related to this appeal. Plaintiff's additional request for adjusted attorney's fees arising out of a deposition the trial court mistakenly believed had not been admitted as evidence is also denied. While Plaintiff asserts the deposition was received at trial, he failed to provide this court with a copy of the exhibit. We decline to consider issues in the absence of a record containing all evidence relevant to the dispute. *See United States v. Mobile Materials, Inc.*, 871 F.2d 902, 906 (10th Cir.1989); Fed.R.App.P. 10(b)(2). Furthermore, the record reflects Plaintiff failed to raise this issue with the district court, and thus the issue is not preserved for appeal. *See Hubbard*, 869 F.2d at 570. Judgment shall be entered accordingly.

AFFIRMED.