**BETACO, INC., Plaintiff–Appellee,**

v.

**The CESSNA AIRCRAFT COMPANY, Defendant–Appellant.**

No. 95–1727.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 11, 1995.

Decided Dec. 10, 1996.

Brian T. Hunt, J.C. Buehler (argued), Indianapolis, IN, for Betaco, Inc.

Robert W. Wright, Stephen L. Vaughan (argued), Jeffrey R. Gaither, Locke, Reynolds, Boyd & Weisell, Indianapolis, IN, for Cessna Aircraft Co.

Before FLAUM and ROVNER, Circuit Judges, and WILLIAMS, District Judge.*

ILANA DIAMOND ROVNER, Circuit Judge.

Betaco, Inc. agreed to purchase a six-passenger CitationJet from the Cessna Aircraft Company for $2.495 million. After making deposits totaling $150,000 toward the purchase of the aircraft, Betaco decided that the anticipated range of the plane was unsatisfactory and canceled the contract. Cessna, invoking a contractual provision entitling it to keep deposits as liquidated damages in the event of cancellation, refused to return the $150,000 Betaco had advanced. Betaco filed this diversity action contending, among other things, that Cessna had breached a purported warranty not contained in the signed purchase agreement that the new CitationJet would have "more range" than its predecessor, the Citation I. A jury agreed that Cessna had made and breached the extrinsic warranty, and the district court ordered it to pay damages of $150,000 plus pre- and post-judgment interest.

In a prior appeal, we vacated the award of damages and remanded for the purpose of a bench hearing on whether the parties intended the purchase agreement they signed to be the complete embodiment of their contract. *Betaco, Inc. v. Cessna Aircraft Co.*, 32 F.3d 1126 (7th Cir.1994). After conducting that hearing, the district court answered this question in the negative. Finding that deter-

---

* The Honorable Ann Claire Williams, of the North-   ern District of Illinois, sitting by designation.

mination to be clearly erroneous, we reverse and remand with directions to enter a final judgment in favor of Cessna.

## I.

Our opinion in the previous appeal contains an extensive summary of the underlying facts, and we will assume the reader's familiarity with that opinion. To set the stage for our analysis in this appeal, we shall repeat only a few key points.

In response to Betaco owner J. George Mikelsons' request for information about the CitationJet, Cessna sent Mikelsons a packet of materials including a cover letter from Robert T. Hubbard, a regional manager for Cessna, a twenty-three page executive summary providing general information and performance estimates for the new plane, and an unsigned but otherwise completed purchase agreement. In pertinent part, Hubbard's letter stated:

> Although a completely new design, the CitationJet has inherited all the quality, reliability, safety and economy of the more than 1600 Citations before it. At 437 miles per hour, the CitationJet is much faster, more efficient, and has more range than the popular Citation I. And its luxurious first-class cabin reflects a level of comfort and quality found only in much larger jets.

Pl.Ex. 1; *see* 32 F.3d at 1127–28.

The purchase agreement occupied both sides of one sheet of paper. "Exhibit A," attached and incorporated into that agreement, set forth preliminary specifications indicating that at its maximum gross takeoff weight of 10,000 pounds, the CitationJet would have a full fuel range of 1,500 nautical miles, plus or minus four percent, under specified conditions. Pl.Ex. 2 at 5 § 2. A highlighted clause in the purchase agreement disclaimed warranties beyond those contained in the preliminary specifications:

> EXCEPT FOR THE EXPRESS TERMS OF SELLER'S WRITTEN LIMITED WARRANTIES PERTAINING TO THE AIRCRAFT, WHICH ARE SET FORTH IN THE SPECIFICATION (EXHIBIT A), SELLER MAKES NO REPRESENTATIONS OR WARRANTIES EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE, OR OTHERWISE WHICH EXTEND BEYOND THE FACE HEREOF OR THEREOF.... NO PERSON OR ENTITY IS AUTHORIZED TO MAKE ANY REPRESENTATIONS OR WARRANTIES OR TO ASSUME ANY OBLIGATIONS ON BEHALF OF SELLER.

Pl.Ex. 4 at 1. The agreement also included an integration clause:

> This agreement is the only agreement controlling this purchase and sale, express or implied, either verbal or in writing, and is binding on Purchaser and Seller, their heirs, executors, administrators, successors or assigns.... Purchaser acknowledges receipt of a written copy of this Agreement which may not be modified in any way except by written agreement executed by both parties.

Pl.Ex. 4 at 2 § IV ¶ 7. After making two modifications to the purchase agreement, Mikelsons signed it on behalf of Betaco. Ursula Jarvis, Cessna's administrative director, accepted one of Mikelsons' changes and rejected the other. *See* Pl.Ex. 10. She signed the agreement on behalf of Cessna.

In the first appeal, we reversed as premature the district court's ruling on summary judgment that the purchase agreement and incorporated specifications did not embody the parties' complete agreement, notwithstanding the express language disclaiming extrinsic warranties and declaring the purchase agreement to be the sole contract between the parties. We noted several circumstances which, contrary to the district court's finding, suggested that the parties in fact did intend for the purchase contract to reflect their complete agreement. First, the contract contained clauses expressly disclaiming extrinsic warranties and deeming the contract to be fully integrated; and we noted that the latter provision in particular is considered " 'strong evidence' " that the written contract represented the entirety of the agreement between the parties. 32 F.3d at 1133 (quoting *L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.*, 9 F.3d 561, 569 (7th Cir.1993)). Second, we were skeptical of the notion that an extrinsic term as to the relative range of the aircraft was not the type of term that would ordinarily be included within

the agreement itself. *Id.* at 1134–36. Third, we did not think it significant that Mikelsons had failed to consult with a lawyer before signing the purchase agreement. The contract was not lengthy or obtuse, we pointed out, and Mikelsons, who had extensive experience as a pilot, airline executive, and purchaser of aircraft, was a sophisticated buyer. *Id.* at 1136.

Faced with these facts, we were tempted to hold, as a matter of law, that the purchase agreement was fully integrated (barring Betaco from seeking to establish the breach of any extrinsic warranty); but a reference in Mikelsons' affidavit to pre-contractual discussions about the range of the CitationJet convinced us that an evidentiary hearing on the matter was in order. Mikelsons' affidavit suggested that the "more range" reference in Hubbard's letter might have been the culmination of substantial discussions between the parties addressing Mikelsons' concern that the new jet be able to fly greater distances than the Citation I. If that were so, then there was at least the possibility that the later-signed purchase agreement did not embody all terms of the contract between the parties. We therefore remanded the case for a bench hearing as to whether the parties intended for the signed purchase agreement to constitute their entire agreement. *Id.* at 1137–38.

After taking evidence on this issue, the district court concluded that the parties did not intend for the purchase agreement to be a fully integrated document, and that the parties intended for the "more range" representation in Hubbard's letter to be a basis of their bargain. Consequently, the parol evidence rule (Kan.Stat.Ann. § 84–2–202) did not bar the introduction of the evidence on which the jury had relied in finding that Cessna had made an express warranty as to the relative range of the CitationJet and that it had breached that warranty. The court accordingly reinstated the jury's verdict on Count II of Betaco's complaint, the sole count on which Betaco had prevailed.

The court found at the outset that Mikelsons was a sophisticated purchaser of aircraft. Entry of Findings at 2 ¶ 6. Mikelsons had "built American Trans Air, the nation's tenth largest airline, from the ground up." Memorandum at 1. In addition, he had logged many hours as a pilot, he had extensive experience in the cockpits of a variety of aircraft, Betaco (of which Mikelsons is president) owned both a Citation I and a Citation II, and he was a frequent pilot of the Citation I. Entry of Findings at 2, ¶¶ 2–6; Memorandum at 1–2.

The court found further that at some time prior to receiving the packet of materials concerning the CitationJet that included the purchase agreement, "Mr. Mikelsons had one or more conversations with a Cessna representative in which Mr. Mikelsons expressed a desire to purchase an airplane comparable to the Citation I but with more range...." Entry of Findings at 3 ¶ 8.[1] Mikelsons, who flew the Citation I predominantly on personal trips, but sometimes on business, had found the range of that aircraft insufficient on occasion to reach the intended destination without a fuel stop. Memorandum at 2. Mikelsons testified, and the district court found, that in his discussions with the Cessna representative about the Citation I, he was assured that the CitationJet would have more range than the Citation I. Entry of Findings at 3 ¶ 8.

The court explained that "more range" in the aviation industry connotes a greater range at maximum takeoff weight with a full load of fuel. *Id.* ¶ 9. This, of course, is the payload configuration at which the specifications incorporated into the purchase agreement warranted a particular range (1,500 nautical miles), and as the district court noted, "the evidence is uncontradicted that the CitationJet *did* have greater range at that configuration." Memorandum at 4 n. 3 (emphasis in original). But, the court proceeded, "Mr. Mikelsons also testified at trial that the

---

1. The court believed that one or more such conversations had occurred because (1) Cessna had not included a purchase agreement in the informational packets it sent to other prospective customers, and it likely would not have forwarded a completed agreement to Mikelsons without prior discussion, (2) it was "highly doubtful" that Mik-

elsons would have signed the agreement, let alone on the very day he received it, without first contacting a Cessna representative, and (3) Mikelsons added terms to the agreement indicating that he had knowledge beyond the information included in the materials sent to him. Memorandum at 3.

'more range' language meant 'more range at all payload configurations' *to him.*" *Id.* (emphasis in original). Thus, "[a]lthough it may be true that range comparisons are done at maximum gross takeoff weight with full fuel, it is not unreasonable to assume that, unless otherwise indicated, the range ratio of one airplane to another is relatively consistent throughout the spectrum of payloads." *Id.* Consistent with that assumption, the court found that "Mr. Mikelsons believed that the CitationJet's range would be significantly greater at all payload configurations than the Citation I's" (Entry of Findings at 4 ¶ 12), that he believed that the "more range" representation was a basis of the bargain and part of the contract (*id.* ¶ 13), and that Betaco would not have entered into the contract with Cessna had Mikelsons not believed that the CitationJet would have a greater range than the Citation I at all payload configurations (*id.* at 3 ¶ 11).

The district court found that Cessna shared Betaco's belief as to the relative range of the CitationJet and believed it to be part of the bargain. Entry of Findings at 4 ¶ 17; Memorandum at 8–9. "The foremost evidence supporting this conclusion is Cessna's clear attempt to attract customers in general, and Mr. Mikelsons specifically, with the range comparisons to the Citation I." Memorandum at 9. Moreover, Cessna's conduct after it entered into the purchase agreement supported the notion that Cessna believed the range comparison to be among the terms of its contract with Betaco. The court pointed out that several months after the contract was signed, Cessna sent Betaco an update on the CitationJet that contained preliminary data indicating that the new jet's range would exceed that of the Citation I by at least 100 nautical miles at all payload configurations. Memorandum at 9. "Clearly, at least as of April 3, 1990, Cessna had every intention of manufacturing an airplane with a greater range at all configurations than the Citation I." *Id.* Finally, the court noted that when Betaco first expressed concern that the CitationJet would not live up to this expectation, Cessna did not insist that "more range" was beyond their agreement, but instead attempted to persuade Betaco that the plane would, in fact, outdistance the

Citation I at all payload configurations. *Id.* at 9–10.

Having found that the parties had intended the extrinsic term as to the relative range of the CitationJet to be a key term of their bargain, the court concluded that the purchase agreement, notwithstanding the integration clause, could not be deemed a fully integrated document. Memorandum at 10. In this regard, the court observed:

> Mr. Mikelsons did not know that he could rely on representations made in the Purchase Agreement or Specifications but not in the Hubbard letter or executive summary. He thought it was all part of "the deal." The integration clause in the Purchase Agreement does not clearly dispel such a notion. The clause integrates the parties' agreement into "this Agreement," but does not indicate what "this Agreement" is. Considering the fact that the word "agreement" is capitalized, that the clause speaks of a written copy of "this Agreement," and that elsewhere in the agreement it notes that "this Purchase Agreement" is "the 'Agreement,'" we, as attorneys, can rather easily conclude in retrospect that "this Agreement" refers to the writing on the front and back of the Purchase Agreement. This conclusion would not be openly evident to a layman based on a reading of the integration clause, or the entire Purchase Agreement for that matter. The Purchase Agreement, or "the Agreement," could have been further defined: "the terms of which are found exclusively on this page and the reverse page," but it was not. This deficiency in the integration clause is especially important in this case where the Purchase Agreement was sent with a packet of materials, some of which were ostensibly intended to be part of the agreement and some of which were not.

Memorandum at 6–7 (footnotes and record citation omitted).

## II.

■ We are satisfied that our first opinion adequately sets out the applicable legal principles, and no more than a modest re-cap is required here. Kansas law, of course, gov-

erns this dispute, and section 84–2–202 of the Kansas Statutes provides that a document intended by the parties as a final expression of their agreement may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement, and may not be supplemented with evidence of consistent additional terms when a court finds that the parties intended the document to be the "complete and exclusive statement of the terms of the agreement." Kan. Stat. Ann. § 84–2–202(b). Thus, to the extent that Betaco and Cessna intended for the signed purchase agreement to include each and every term of their agreement, Betaco cannot attempt to establish by parol evidence a term beyond the four corners of that document and seek to recover damages for the purported breach of that term. *Id.; see* 32 F.3d at 1131. In assessing the intent of the parties, the following factors should be considered: (1) the inclusion of merger or integration clauses in the document under consideration, (2) the disclaimer of warranties, (3) whether the extrinsic term is one that the parties would certainly have included in the document had it been part of their agreement, (4) the sophistication of the parties, and (5) the nature and scope of both prior negotiations between the parties and any purported extrinsic terms. *Id.* at 1132–33 (quoting *Mid Continent Cabinetry, Inc. v. George Koch Sons, Inc.,* 1991 WL 151074, at *8 (D.Kan. July 11, 1991)).

█ The question of the parties' intent is typically a factual one, particularly when it turns not just on the written provisions of their contract but on surrounding events that the parties may have interpreted and recalled differently. 32 F.3d at 1131. In this case, for example, Mikelsons testified that he had one or more conversations with Cessna officials about the relative range of the CitationJet before he received and signed the purchase agreement. Cessna denies that any such conversations took place. The district court credited Mikelsons on this point,

and this assessment was obviously key to the district court's determination that the parties did not intend for the purchase agreement to be a fully integrated document. We are loathe to second-guess the district court's factual findings. Yet, the contractual language disavowing terms beyond the face of the purchase agreement is plain and unequivocal, and the evidence that Cessna has adduced in an effort to overcome this language is exceedingly weak. Having reviewed the record, we are unable to sustain the district court's ultimate finding that the parties did not intend for the purchase agreement to be fully integrated; that finding was, we believe, clearly erroneous.[2] The analysis which leads us to that conclusion will follow the list of relevant factors we identified above.

## A. Merger and Integration Clauses

█ As we observed in *Betaco I,* the inclusion of an integration clause in a written document is " 'strong evidence' " that the parties intended that document to represent the entirety of their agreement. 32 F.3d at 1133 (quoting *L.S. Heath & Son,* 9 F.3d at 569). The purchase agreement executed by Betaco and Cessna contains such a clause, stating both that the signed agreement "is the only agreement" controlling the purchase of the aircraft, that it "is binding on Purchaser and Seller," and that the agreement "may not be modified in any way except by written agreement executed by both parties." Pl.Ex. 4 at 2 § IV ¶ 7. We noted that the language of the clause is simple and straightforward, that it was not buried in fine print, and that it was not otherwise likely to be overlooked in an agreement that covered only two pages. 32 F.3d at 1133–34. We also pointed out that Mikelsons had signed the agreement containing this clause and that he had had the opportunity to review it before signing. *Id.* at 1134.

The integration clause speaks for itself, of course, and nothing adduced on remand has shaken our conviction that it constitutes

---

**2.** The clearly erroneous standard of review requires us "to distinguish between the situation in which we *think* that if we had been the trier of fact we would have decided the case differently and the situation in which we are *firmly convinced* that we would have done so." *Carr v. Allison Gas Turbine Div., General Motors Corp.,*

32 F.3d 1007, 1008 (7th Cir.1994) (emphasis in original). Our review "thus is deferential, but it is not abject." *Id.* Statements found in some cases suggesting that the standard is so deferential as to be nearly insurmountable are not authoritative. *Id.*

strong evidence that the parties intended the written purchase agreement to constitute the full embodiment of their contract. *Id.* at 1133–34. On the contrary, although extrinsic evidence ordinarily is unnecessary to establish that the parties to an agreement meant what they said in their contract,[3] Mikelsons' testimony on remand only confirms that the integration clause should be taken seriously. Mikelsons acknowledged that in signing the contract, he verified that he had read it, that he understood it, and that he had full authority to bind Betaco with his signature. Tr. 85; *see* Pl.Ex. 4 at 1. He acknowledged what the integration clause said; indeed, when asked by Cessna's counsel what he understood the language to mean, he answered, "Just exactly what it says, Mr. Buehler—that this contract is the only contract between the parties." Tr. 34.

■ Now, Mikelsons also testified that he believed that Cessna's marketing was incorporated into the agreement (Tr. 34), and the district court thought the integration clause sufficiently unclear as to what it meant by "this Agreement" that a layperson might think that the agreement included representations outside of the purchase agreement itself (Memorandum at 6–7). Both suppositions fly directly in the face of the plain terms of the agreement. Taking the district court's point first, we discern no ambiguity as to what is meant by "this Agreement." In a document *entitled* "PURCHASE AGREEMENT," the consistent use of "this" naturally points the reader to the purchase agreement itself. Any doubt in this regard is then eradicated by the first paragraph on the reverse side of the agreement, entitled "TERMS AND CONDITIONS":

> The Purchaser and Seller as set forth in Items 1 and 2 hereby enter into this Purchase Agreement (the "Agreement") for the purchase and sale of one (1) Cessna CITATIONJET Model 525 Aircraft, with optional equipment as listed in Item 5 herein (the "Aircraft") on the terms and conditions as set forth on the face hereof and as follows[.]

Pl.Ex. 4 at 2. The parties to a contract are presumed to comprehend contract terms in the way those terms are ordinarily used. *E.g., McGee v. Equicor–Equitable HCA Corp.,* 953 F.2d 1192, 1202 (10th Cir.1992) (applying Kansas law). Thus, the district court's concerns about the lack of clarity notwithstanding, it is entirely reasonable to charge Mikelsons and Betaco with the realization that when the contract spoke of "this Agreement" being the sole agreement between the parties and disclaimed all representations beyond it, it meant that only those terms expressly incorporated within the two-page purchase agreement itself were part of the bargain. Mikelsons conceded that very understanding, in fact. Tr. 34. He claims to have thought that Hubbard's letter was imported into the agreement by virtue of a reference to marketing within the preliminary specifications (which were, of course, expressly made part of the purchase agreement). Tr. 34; *see also* Tr. 30. But that notion is both implausible and unreasonable. The word "marketing" appears in the preliminary specifications only twice, once on the title page and again on the introductory page, which simply indicate that the specifications were prepared by, and that more detailed information could be obtained from:

> Citation Marketing
> The Cessna Aircraft Company
> P.O. Box 7706
> Wichita, Kansas 67277

Pl.Ex. 2 at 2, 3. It is one thing to infer from these unadorned references to "Citation Marketing" that questions left unanswered by the preliminary specifications should be directed to a marketing representative; it is quite another to infer that anything a Cessna representative might say in promoting the plane, including the type of representations made in Hubbard's letter, would become a term of the purchase agreement. In the face

---

**3.** *Compare Ray Martin Painting, Inc. v. Ameron, Inc.,* 638 F.Supp. 768, 773–74 (D.Kan.1986) (integration clause in written warranty agreement negotiated and signed by two experienced business entities supported finding as a matter of law that written agreement was fully integrated) *with Transamerica Oil Corp. v. Lynes,* 723 F.2d 758, 763 (10th Cir.1983) (warranty disclaimer language in invoice that purchaser signed to acknowledge receipt of product did not render invoice a fully integrated contract; thus, proof of extrinsic term allowed).

of contractual terms expressly disavowing extrinsic warranties, admonishing that no individual was authorized to make representations on Cessna's behalf, and providing that modifications to the agreement had to be made in a writing signed by both parties, the latter inference strains credulity.

## B. Warranty Disclaimers

A disclaimer of extrinsic warranties complements and reinforces the integration clause by making clear what is implicit in the notion of a fully integrated contract: that no representation not documented in the written agreement itself is part of the parties' bargain. Two brief points about the warranty disclaimer in this case deserve emphasis.

First, as we pointed out in *Betaco I*, the purchase agreement, in language highlighted by capitalized lettering, specifically disclaimed all warranties not expressly made part of the agreement and admonished that no one was authorized to make other warranties on Cessna's behalf. Pl.Ex. 4 at 1; *see* 32 F.3d at 1133. That alone calls into question the viability of a breach of warranty claim based on an extrinsic writing like Hubbard's cover letter to Mikelsons.

Second, this is not a case in which the purchase agreement purports to disclaim any and all warranties. Rather, as acknowledged in the disclaimer clause itself, the representations as to performance of the new jet set out in the preliminary specifications were made part of the contract. Those specifications, in turn, did address the range of the aircraft, indicating that it would have a full fuel range of 1,500 nautical miles under specified conditions. Taken at face value, therefore, the disclaimer clause confined Cessna's obligations as to the expected performance of the CitationJet to a limited and very specific set of preliminary specifications and expressly disavowed the type of casual representation made in Hubbard's letter.

Again, the testimony below gives us every reason to believe that Mikelsons appreciated the significance of the contract's language. Mikelsons affirmed that he had read and understood the warranty disclaimer provisions. Tr. 90. He also acknowledged that he was quite familiar with such provisions:

Q. Now, do you know what warranty disclaimers are?

A. Yes.

Q. Have you seen many in your lifetime?

A. Yes.

Q. Have you had warranty disclaimers in many of the contracts that your business has prepared?

A. Yes.

Q. So you're well acquainted and well experienced with warranty disclaimers?

A. Yes.

Tr. 85. Thus, we have contract language that is clear as to which warranties were made part of the agreement and which were not, signed by an individual who knew from his own experience what such disclaimers meant.

## C. Whether the Alleged Extrinsic Warranty Was One That the Parties Certainly Would Have Included within the Purchase Agreement.

The purchase agreement itself was not silent as to the anticipated range of the CitationJet. The preliminary specifications incorporated into that agreement contained a section on "estimated performance" which listed some seven factors, among them the full fuel range of the aircraft; we reproduced that section in full in *Betaco I*. 32 F.3d at 1135. As we pointed out, "[t]his summary of the aircraft's performance is, in stark contrast to [Hubbard's] letter, quite precise and quite explicit about the assumptions underlying each of the estimates." *Id.* at 1136. Thus, Cessna clearly was willing to make certain performance estimates part of the contract, but when it did so it gave concrete estimates (a full fuel range of 1,500 nautical miles, for example) and made explicit the conditions under which those estimates would apply.

The fact that the purchase agreement addressed the range and did so with specificity indicates to us that had Cessna and Betaco intended for any additional representations as to the range of the CitationJet to be included in their contract, they would have been made an explicit part of the purchase agreement. It is not as if the relative range of the CitationJet vis-à-vis the Citation I was

different from the other types of factors addressed in the preliminary specifications, or one that could not be reduced to the level of detail otherwise reflected in the specifications. In fact, the only sense in which Hubbard's "more range" representation stands apart in kind from the terms expressly included in the contract is its extraordinary ambiguity. Given that the contract otherwise described the expected performance of the aircraft with a high degree of specificity, making all of the assumptions underlying each expectation explicit, it is utterly implausible to think that the parties would have understood the types of casual representations found in Hubbard's letter to be part of the same contract. Indeed, it is hard to believe that a manufacturer of aircraft that had attempted to limit its obligations to a carefully delineated set of performance estimates would substantially increase its exposure with an indefinite term like "more range." Equally implausible is the suggestion that Mikelsons, an experienced and sophisticated purchaser of aircraft with a professed concern about range, and with a staff available to crunch the numbers, would be content to spend nearly two-and-a-half million dollars on a plane on the mere assurance that it had "more range" than an earlier model. The district court thought that the parties treated this transaction more like the purchase of a family car than the purchase of a multi-million dollar jet. Memorandum at 5 n. 5. It may be that Mikelsons treated the purchase that casually. But we find no evidence in the record that Cessna did, or in particular that Cessna shared Mikelsons' professed expectation that an indefinite, extrinsic term like "more range" would become a term of the contract.

D. Sophistication of the Parties

Mikelsons brought with him to the purchase of the CitationJet a wealth of experience and sophistication. As the district court recognized, "[Mikelsons'] experience in the business of aviation cannot be denied." Memorandum at 2. He had logged over 18,000 hours in a variety of aircraft. He had established one of the nation's major airlines. Betaco, of which he was president, was in the business of purchasing and leasing aircraft. Betaco previously had purchased second-

hand from Cessna a Citation I as well as a Citation II. Mikelsons himself had flown the Citation I extensively. Thus, as the district court found, "Betaco and Cessna were in relatively equal bargaining positions in this transaction." Entry of Findings at 2 ¶ 6.

Mikelsons is not, as the district court emphasized, a lawyer (see Memorandum at 6–7); and yet, his familiarity with the types of contract terms at issue here rendered him fully able to appreciate the import of those terms. As we have pointed out, Mikelsons read and understood the language in the purchase agreement disclaiming extrinsic warranties; he likewise read and understood the integration clause.

■ We normally attribute to the signatories to a written agreement knowledge and understanding of the terms contained in that agreement. 32 F.3d at 1136 (quoting *Rosenbaum v. Texas Energies, Inc.*, 241 Kan. 295, 736 P.2d 888, 891–92 (1987)). Mikelsons' degree of sophistication certainly gives us no reason to depart from that rule here.

E. Nature and Scope of Prior Negotiations and the Purported Extrinsic Term

Despite the integration clause and the disclaimer of extrinsic warranties in the purchase agreement, Mikelsons' affidavit raised the possibility that the parties had engaged in substantial pre-contract negotiations as to the anticipated range of the CitationJet *relative* to the Citation I, a subject not addressed in the purchase agreement itself but that Betaco insists was central to its decision to purchase the new aircraft. Exploration of this possibility was the purpose of the remand we ordered. 32 F.3d at 1137–38.

■ We did not mean to suggest, of course, that the door is open to proof of an extrinsic term whenever a party can establish that the subject of that term was discussed before the contract was signed. That would render contractual provisions disavowing any and all terms not contained within the four corners of the contract, not to mention statutory provisions like section 2–202, virtually meaningless. Rather, only in limited circumstances can a party overcome the bar of integration clauses and warranty disclaimers. *Transamerica Oil Corp. v. Lynes*, 723 F.2d 758 (10th Cir.1983) (applying Kan-

sas law), which we cited in *Betaco I,* offers an illustration. There, a company that drilled oil and gas wells purchased a product based on representations made in the manufacturer's advertising and in discussions with the manufacturer's representatives. When the product failed to perform as expected, the purchaser sued for breach of warranty. The manufacturer sought to rely on warranty disclaimers contained in the invoices that the purchaser signed on receipt of the product. The Tenth Circuit concluded that proof of extrinsic warranties was permissible nonetheless. "There was no negotiated document signed by both parties evidencing the sale of one or all of these [products]," the court pointed out *(id.* at 763), there was only the purchaser's signature on the invoice below the words "I certify that the above materials or services have been received" *(id.).* "These words indicate that the document is a delivery receipt and possibly a billing statement, but not a fully integrated contract." *Id.* Thus, despite additional language acknowledging the terms on the reverse side of the invoice, which included the warranty disclaimer, the court was satisfied that the invoice did not reflect the final agreement of the parties. *Id. Transamerica Oil* indicates, then, that the parties may resort to extrinsic terms in the face of contractual provisions disclaiming any and all such terms when, as was the case there, the terms of the disclaimer were unexpected and unbargained for. *See* Kan. Stat. Ann. § 84–2–316(1), official U.C.C. comment, "Purposes" ¶ 1; *see also* 723 F.2d at 762. Having reviewed the evidence adduced on remand, we are satisfied that the circumstances of this case do not fit within that narrow category.

This is not a case in which the purchaser of a product, whose expectations have been entirely shaped by precontract representations, is asked upon delivery to execute an "invoice" in which he unwittingly surrenders any and all claims based on those extrinsic representations. *Cf. Transamerica Oil,* 723 F.2d at 763; *Hemmert Agric. Aviation v. Mid–Continent Aircraft Corp.,* 663 F.Supp. 1546, 1553 (D.Kan.1987). Mikelsons was presented with a written purchase agreement in advance of his order, and he obviously controlled the timing of the order. He had, as we noted in *Betaco I,* every opportunity to review the agreement himself, to have his staff review it, and to seek the advice of legal counsel. 32 F.3d at 1134, 1136. The agreement incorporated detailed specifications as to the performance of the aircraft, and explicitly disclaimed any warranties not contained in those specifications. The limits of the contract were therefore plain, and neither time, disparity of resources, nor any other circumstance prevented Mikelsons and Betaco from appreciating those limits.

It is also clear that the terms of the purchase agreement did not amount to a take it or leave it proposition, depriving Betaco of the opportunity to negotiate further terms of importance to it. Before signing and returning the agreement to Cessna, Mikelsons added two terms to the agreement: one invoking the right to opt for an earlier delivery and aircraft serial number, in the event one became available, and the other invoking the right to exercise such an option at a price appropriate to the earlier serial number. Pl. Ex. 4 at 1. Jarvis, in turn, on Cessna's behalf, accepted one of these additional terms (that concerning an earlier delivery and serial number) and rejected the other. Pl.Ex. 10 at 1; *see also* Pl.Ex. 10 at 2 (final purchase agreement as modified).

In sum, we have a purchase agreement which in straightforward language declares itself to be the only agreement between the parties. Its principal provisions occupied a single sheet of paper. It incorporated written specifications as to the expected performance of the new aircraft, including its range. It expressly disclaimed any other warranties beyond these. It was presented to a sophisticated purchaser well grounded in aeronautics, who had purchased aircraft before, who was in the *business* of buying and leasing aircraft (not to mention running an airline). He read and understood the integration clause, he read and understood the warranty disclaimer clause—he had read such clauses before. He signed the contract at a moment of his own choosing, after making modifications.

All of this weighs heavily in favor of honoring the integration and warranty disclaimer clauses and precluding Betaco's effort to read into the parties' agreement an extrinsic term as to the relative range of the Citation-Jet. Mikelsons could not have been taken by

surprise by the contents of the purchase agreement in any sense of the word.

As we noted earlier, the district court found that at some time before Hubbard sent the purchase agreement and other materials to Mikelsons, "Mr. Mikelsons had one or more conversations with a Cessna representative in which Mr. Mikelsons expressed a desire to purchase an airplane comparable to the Citation I but with more range and in which the Cessna representative informed Mr. Mikelsons that the CitationJet had more range than the Citation I." Entry of Findings at 3 ¶ 8. We do not know which Citation representative made this assertion (it may have been Hubbard, but Mikelsons could not recall, see, e.g., Tr. 58, 95), we do not know how many conversations there might have been, and we do not know in what detail the relative range of the two planes was discussed. But under Betaco's theory of the case, these discussions were the genesis of the "more range" representation in Hubbard's letter, a representation that Betaco insists, and the district court found, was central to Betaco's decision to purchase the plane. Entry of Findings at 3.

The indefinite character of the "more range" representation in Hubbard's letter remains as troublesome now as it was in the first appeal. As we noted in *Betaco I*, Hubbard's letter is "long on adjectives and short on details" (32 F.3d at 1135) and in that respect appeared much more like a standard promotional letter than the confirmation of a key contract term. It is now undisputed that Hubbard's letter was, in fact, a canned letter sent to many prospective purchasers of the CitationJet. Tr. 11415. So nothing in the content of the letter grew out of the one or more discussions Mikelsons previously had with the Cessna representative. More importantly, it is not at all clear what "more range" means.

The district court's findings on this key point are inconsistent. Recall that the district court first observed:

> The term "more range" means, as used in the aviation industry, greater range when compared at identical (standard) atmo-

spheric conditions with each plane at its maximum gross takeoff weight with a full load of fuel.

Entry of Findings at 3, ¶ 9. Yet, as the district court itself noted, "the evidence is uncontradicted that the CitationJet *did* have greater range at that configuration." Memorandum at 4 n. 3 (emphasis in original). Thus, attributing the industry's understanding of "more range" to Hubbard gets Betaco nowhere; only if "more range" is construed to mean more range at *all* payloads does Betaco have a basis to claim a breach of this purported warranty. Here the district court equivocated. Despite the limited understanding in the industry of the phrase "more range," the court found that Mikelsons understood it to mean more range at all payloads. *Id.*; Entry of Findings at 4 ¶ 12. In the court's view, it was reasonable for Mikelsons to make this leap. "Although it may be true that range comparisons are done at maximum gross takeoff weight with full fuel," the court conceded, "it is not unreasonable to assume that, unless otherwise indicated, the range ratio of one airplane to another is relatively consistent throughout the spectrum of payloads." Memorandum at 4 n. 3. The principal support that the court cited for the notion that this was an assumption and understanding of "more range" that Cessna shared was a performance update that Cessna sent to Mikelsons on April 3, 1990, more than two months after Hubbard sent his letter to Mikelsons and Mikelsons signed the contract. Pl.Ex. 9 at 4; *see* Memorandum at 4 n. 3. That update contained a graph indicating that the CitationJet would have a greater range at all payloads than the Citation I. *See id.* But whatever this post-contract update may reveal about Cessna's expectations of the plane's performance, it tells us nothing about what Cessna's understanding of the contract was at the time Cessna and Betaco entered into it; and there certainly is no evidence establishing that Cessna agreed to make this "update" a contractual obligation on par with the preliminary specifications that had been incorporated into the contract expressly.[4]

---

4. As additional support for this proposition, the district court cited Cessna's effort to attract customers by trumpeting the CitationJet's greater range, as well as its efforts to persuade Betaco, once cancellation was threatened, that the new plane would in fact have more range than its predecessor at all payloads. Memorandum at 9–10. Vague marketing references to "more range" of the kind found in Hubbard's letter do

In essence, the court found that the parties made part of their agreement a vague, extrinsic term that purportedly has a particular meaning in the industry, but then it accorded that term a significantly broader meaning based on speculative assumptions in order to support Betaco's theory of recovery. This is a house of cards, and if the tenuous character of its tenets does not bring it down, the nature of Hubbard's letter does. To accept the notion that Hubbard's "more range" representation was a term as to which the parties shared a particular understanding that they wished to make part of their bargain, one must assume that it either was subject to negotiation or at least the culmination of negotiation. But, as we have noted, the evidence is undisputed that Hubbard's letter was a canned letter produced from Cessna's stock promotional correspondence. Thus, even if that letter and the accompanying materials were sent to Mikelsons in response to his inquiries,[5] there is no evidence that *any* term in the letter was written to address Mikelsons' professed requirement that the CitationJet have a range in excess of the Citation I's range at all payload configurations. There is, in short, no basis for attributing to Hubbard's "more range" representation the kind of particularized meaning that the district court found it to have.

We are left, then, with Mikelsons' unilateral expectation, based on the pre-contract conversations with Cessna representatives that the district court found to have occurred, that the new jet would have more range than the Citation I at all payloads. Given the circumstances of this case, this is not enough to overcome the plain terms of the purchase agreement eschewing any and all such extrinsic terms.

### III.

It is important to recall where our analysis began. The parol evidence rule bars evidence of extrinsic terms where the parties intended for a particular document to embody their complete agreement. The purchase agreement that Cessna and Betaco signed suggests on its face that the parties did intend for that document to represent the sole and exclusive agreement between them: the agreement contained an integration clause, and it also disclaimed any warranties beyond those expressly incorporated into the agreement. These provisions were neither hidden nor incomprehensible. Mikelsons read and understood them before signing the contract.

The question, then, is whether the evidence Betaco adduced on remand is sufficient to overcome the presumption that the contract meant what it said, and that no terms not expressly included within the purchase agreement were made part of the bargain. It is far from sufficient. Although we accept, as we must, the district court's finding that Mikelsons had one or more conversations with Cessna representatives in which he was assured that the CitationJet would have more range than the Citation I, there is a paucity of evidence indicating that the parties shared an intent to make any such representation a part of their bargain. Hubbard's representation that the CitationJet would have "more range" than its predecessor came in the form of a standard promotional letter sent to countless other prospective purchasers. Moreover, if one attributes to "more range" the meaning that phrase typically carries in the aviation industry—more range at gross takeoff weight with a full load of fuel—it was wholly duplicative of the purchase agreement, which specified that the CitationJet would have a range of 1,500 nautical miles at that payload configuration, a range concededly greater than the range of the Citation I. Only if one broadens the meaning of "more range" to connote more range at *all* payloads does that term add anything to the purchase agreement, and yet there is

---

not in any way clarify under what payload configurations the CitationJet was to outperform the Citation I. Moreover, Cessna's belief that the range of the new jet would exceed that of the Citation I in all instances sheds no light on what Cessna had agreed to *warrant* in the contract. It does not strike us unusual that a reputable manufacturer would expect and intend for its product to perform beyond its warranted specifications; but the manufacturer's confidence in its product alone does not give rise to a contractual obligation.

5. They were sent to Hubbard by express mail, with Mikelsons' name and address, as well as a price and delivery date, already filled in on the purchase agreement.

no evidence that that is what Cessna understood the "more range" reference in Hubbard's letter to mean.

At bottom, what Betaco has attempted to do is to retroactively make part of its bargain with Cessna its own expectations of the aircraft in direct contravention of the terms of the written agreement it signed. This is what the parol evidence rule classically forbids. The district court was in error in concluding that the written agreement was not fully integrated and in permitting extrinsic evidence of an additional term, and accordingly the jury's verdict in favor of Betaco for breach of that term cannot stand.

## IV.

The district court's finding that the written purchase agreement was not fully integrated, and that proof of an extrinsic term was therefore permissible, is reversed and the case is remanded with directions to vacate the jury's verdict in favor of Betaco on Count II of the complaint and to enter final judgment in favor of Cessna on that count.

REVERSED AND REMANDED.